## Christopher's Adm'r v. Miniard et al.

(Decided March 2, 1937.)

JOUETT & METCALF and C. W. HOSKINS for appellant.

J. M. MUNCY for appellees Miniard.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

In February, 1926, J. B. Miniard died survived by a widow and five children residing in Leslie county. He owned about 1,000 acres of land, worth perhaps $60,000. Not long after his death, there was an agreed partition of the property. In July, 1927, Belva Christopherson, a resident of the state of Washington, filed

suit against the widow and heirs asserting that she was the illegitimate child of J. B. Miniard, and that a bastardy proceeding brought by her mother was dismissed in consideration of his agreement to rear and educate her and make her a lawful heir. It was also set up that in a habeas corpus proceeding, Miniard was given her custody by a judgment of the Leslie circuit court. In that proceeding, it was alleged, Miniard admitted his agreement including that part of it that he would make her "his heir, equal to any of his children that he then had by his wife." Her father had reared and educated her, but had breached that provision of his contract. She averred that she was entitled to an undivided one-sixth of her father's estate and prayed judgment accordingly. Later she asserted a claim for $12,000, in lieu of her claim to a portion of the estate.

In November, 1929, the Miniards filed an answer and counterclaim. In the meantime important events had occurred. In August, 1927, the will of J. B. Miniard devising his entire estate to his widow was lodged in the county court and probated in October. In September, 1927, a compromise and settlement of the suit had been made. In May, 1929, Mrs. Christopherson had died.

The pleading made no reference either to the probate of the will or the plaintiff's death. It traversed the allegations of the petition and affirmatively alleged that the defendant had discovered the plaintiff had had recorded a deed, purporting to have been executed by the defendants on September 12, 1927, conveying to the plaintiff a one-seventh interest in the estate of Miniard in consideration of $1 and the settlement of the plaintiff's claim for $12,000. It was charged that the statements as to the consideration were false and that the instrument was a forgery. The pleading prayed a dismissal of the suit and for a judgment declaring the deed to be void.

Several months later the suit was revived in the name of George P. Fitz, who had qualified as administrator with will annexed of her estate in Kentucky. He filed a pleading, styled "Amended Petition and Answer to the Counterclaim of the Defendants." In it was set forth that the widow and heirs had conveyed a one-seventh undivided interest in the decedent's property to Mrs. Christopher on September 12, 1927. By

reason of the execution and delivery of the deed, it was alleged, the original claim for damages had been settled and adjusted and the inconsistent allegations of the original petition were withdrawn. The plaintiff then asserted that under the deed the estate of Mrs. Christopher was the owner of an undivided one-seventh interest in the property; that the defendants had taken possession of the land (except that sold) and had appropriated the entire property to themselves. A settlement of the Miniard estate and adjudication of the rights of the Christopher estate were asked. The pleading denied the deed of September 12, 1927, was a forgery.

It may be well at this point to say that this amended pleading refers to the original plaintiff as Belva Christopher and that it was subsequently shown in the evidence that her correct name was Christopherson, but both names were used interchangeably. Her husband was a native of Denmark.

In the response to the foregoing pleading, nearly a year later, the defendants denied everything, including the death of Mrs. Christopher, and the qualification of her administrator with the will annexed. Meanwhile proof was being taken. Then in November, 1934, more than three years later, and after the case had been submitted for judgment, there was filed an amended answer and counterclaim to conform to the proof. Reiterating the charge of forgery of the deed conveying a one-seventh interest in the estate to Mrs. Christopher, it was averred "that the true and actual consideration named and mentioned therein is the conveyance of the 100 acre William Turner survey, numbered 6428, and dated July 2, 1845," and that in no event could the plaintiff recover anything under the deed more than that land. That conveyance was set up as in full settlement of the original claim for damages. It was further alleged that Belva Christopher in consideration thereof had on September 12, 1927, executed and delivered a deed conveying to the defendants all her rights, claims, and interest in the Miniard estate; a copy of such instrument being filed with the pleading. An estoppel to maintain the action or to claim other than the 100-acre Turner survey was also pleaded.

A reply presented a traverse, and affirmatively

averred that the alleged deed of Mrs. Christopher to the heirs of an undivided one-seventh interest in lands of her father, in consideration of the 100 acres, was void on the ground of no consideration and because her husband did not join in its execution. Thus more than seven years after the institution of the suit, the ultimate issue was formed. That issue is as to what was the settlement of the original claim, or, more concretely, was it an acceptance by Mrs. Christopher of the 100-acre Turner patent, or an undivided one-seventh interest in the entire estate. Three deeds became involved: (1) A deed dated September 12, 1927, from the widow and four of the children, with their consorts, conveying to Belva Christopher an undivided one-seventh interest in the estate for the recited consideration of $1 and the compromise and settlement of her claim; (2) a deed, also dated September 12, 1927, from Belva Christopher to the widow and four children, of "all land that J. B. Miniard owned on Greasy Fork and its tributaries," with the consideration recited as being "A 100 acre patent made in the name of W. M. Turner, Dec. 4th, 1844, on Turners Creek, deeded to first party by second parties"; and (3) a deed to Belva Christopher of that 100 acres. Neither the original nor copy of this third deed was ever produced. Whether or not there ever was such a deed was in issue. The originals of the two deeds first mentioned were filed and have been brought to us on the appeal, the issue as to both of them being whether they are forgeries. Each deed bears the apparent signatures of the parties and the certificate of acknowledgment by them, signed by A. L. Chappell, a deputy clerk of the county court of Leslie county. He testified that he took the acknowledgments as certified.

All pleadings and evidence pertaining to the alleged forgeries of these two instruments must be disregarded. The statute so requires. An official certificate of this kind imports absolute verity unless attacked in a direct proceeding against the officer or his sureties. The instrument must stand as certified, the execution being conclusive and a plea of non est factum unavailing except upon an allegation of fraud in the obtention of the certificate by a party benefited thereby, or a mistake on the part of the officer. Section 3760. Kentucky Statutes. There was no sort of pleading of this character in the case. Pribble v. Hall, 13 Bush,

61; Everman v. Everman (Ky.) 122 S. W. 135; Campbell v. Schorr, 224 Ky. 1, 5 S. W. (2d) 278; Morgan County National Bank v. Crace, 249 Ky. 461 S. W. (2d) 10; Atkins' Guardian v. McCoy, 263 Ky. 846, 93 S. W. (2d) 839.

As to both the deed from the Miniards to Mrs. Christopher conveying a one-seventh interest, and the deed from her to them of what was probably regarded as her entire interest in the estate, the question is resolved into one of delivery. As to the alleged deed to Mrs. Christopher of the 100-acre patent, there is presented the further question of whether or not there was ever in fact such an instrument either signed or delivered. The term "delivery" in this connection, it must be remembered, is more than a mere manual transfer, for essential elements of a legal delivery are an intention to pass and an intention to accept title to the property covered by the deed. Hood v Nichol, 236 Ky. 779, 34 S. W. (2d) 429; Hardin v. Kazee, 238 Ky. 526, 38 S. W. (2d) 438; Ratcliff's Guardian v. Ratcliff, 242 Ky. 419, 46 S. W. (2d) 504. The decision as to which of these conflicting claims of legal delivery shall be sustained rests upon the determination of what was the compromise and settlement of the suit.

Although it later developed that Miniard had devised his entire estate to his widow, there had been, as we have stated, partition deeds executed by her and the children. So any claim which Belva Christopher had against the estate for the breach of the alleged contract involved the property of each of the defendants. They had signed the deeds to her and had accepted the deed signed by her. Since she was dead when Mrs. Nannie Miniard, the widow, J. R. Miniard, P. C. Miniard, and Charlie Miniard gave their depositions, the court should have sustained the exceptions filed to the greater part of their evidence. They had a direct, real, and vested interest adverse to the decedent, and therefore were clearly incompetent to testify as to any statement made or act done by her. Section 606, subd. 2, Civil Code of Practice; Isaacs v. Isaacs, 206 Ky. 540, 267 S. W. 1104. Except as it related to other subjects, we shall therefore pass by their evidence on that account and also as it pertained in any particular to the nonexecution of the deeds on account of the conclusiveness of the certificates of acknowledgment.

For some time before September 12, 1927, Mrs. Christopher stayed in the neighborhood among her father's family. Felix G. Turner, a merchant in the community, testified that Mrs. Christopher, Mrs. Miniard, and P. Cooper Miniard, a son who seems to have represented the family in this matter, came to his home in September and asked him to prepare two deeds. One was to convey to Belva the 100-acre Turner patent as her part of her father's estate, and by the other she was to convey to the heirs all her remaining interest. He wrote such instruments with a pen on printed forms. The deed which she signed, referred to above, is identified by the witness as being the one he wrote. It is very crude and Mrs. Christopher's signature is below the officer's certificate of acknowledgment. On that occasion she had with her a prepared typewritten deed conveying to her an undivided one-seventh interest in her father's estate. It was not signed, and she stated that the heirs would not agree to sign it. The witness identified the deed to which we have referred as having been signed by the heirs as being the same paper. Mrs. Christopher asked him about the 100 acres, and he told her that Miniard had always claimed it and it was good as far as he knew. The witness did not know whether or not the parties made a different agreement after they left his house.

A. L. Chappell was a deputy county court clerk who lived about ten miles from the Miniard settlement. Belva got him to go over there to take some acknowledgments. She told him she was taking the 100 acres as her part of the estate. He was there two days and nights, during which the parties were trying to reach an agreement. They would discuss the matter and disagree and then go back to talking again. The delay was so great that he threatened to go home. After the witness had been presented with the typewritten deed showing his certificate of acknowledgment by the Miniard heirs, his memory was sharpened and he modified some of his preceding testimony. His evidence as thus modified will be accepted. He testified to an impression that the typewritten deed had been executed before Felix Turner drew up the other deeds on the printed forms. The parties signed those two deeds respectively and he took their acknowledgments. An inexplicable statement is that "there were several deeds made for this 100 acres." Mrs. Christopher took her

deed and the others the one she had signed. She offered to sell him the timber on the 100 acres.

John Hilton, who then lived within four miles of the Miniards and whose people still live in that community, testified that Mrs. Christopher told him she had compromised her suit; that the heirs had deeded her the 100 acres and she had deeded to them her interest in her father's estate. She wanted to rent him the place and read its corners from the deed which she then had, suggesting where he could build a house. She rode to Hyden with the witness three days later and said she would be back in three weeks to make a written lease, but she never returned.

According to Roy Huff, a close neighbor, Mrs. Christopher came to his father's home and asked him about the title to the 100-acre tract, saying that she had taken it as her part of the estate. She tried to sell his father the timber but he did not buy it. The deed which she had with her was typewritten but he did not know whether it was signed or not. It will be recalled that the deed claimed by the defendants to have conveyed the tract was written in ink on a printed form. Being re-examined by defendants' counsel after having a conference with him in another room, the witness stated that he never noticed whether it was typed or on a printed form. The deposition of Maynard Huff, a nephew of the deceased J. B. Miniard and a cousin of the above witness, was to the same effect.

W. H. Jackson deposed that Mrs. Christopher told him the day before she left that she had got her business fixed up and had taken the 100 acres as her part of the estate.

The foregoing is the evidence presented by the defendants, except that we may consider certain parts of the deposition of Joe R. Miniard and P. C. Miniard, which do not come under the ban of section 606 of the Civil Code of Practice. That evidence is that their father had owned the 100 acres two or three times, the last time obtaining it by a sheriff's tax deed. Since their father's death the family have been using and occupying his property including the 100 acres as they had done before, and had paid taxes on it since its conveyance to Belva. Also, they did not know why her deed to the heirs was not recorded until June 10, 1930.

P. C. Miniard deposed that after the deed prepared by Felix Turner had been executed, F. J. Eversole, an attorney for Mrs. Christopher, gave him a typed deed to that 100 acres saying that he "wanted a little more nicer deed" than the one they had. The witness stated he had that unsigned paper before him and that he would file it, together with an envelope in which he had received it, with his deposition but it is not in the record.

We turn to the evidence on the other side.

Mrs. Christopher's husband had died on December 26, 1928, and she on May 6, 1929. The Guaranty Trust Company of Yakima, Wash., had qualified as the executor of her will. An attorney in that city testified that in consulting him about the preparation of her will (which is dated May 1, 1929), Mrs. Christopher talked to him about her relationship to J. B. Miniard and told him about having the deed to a one-seventh interest in his estate. Another attorney whom she had consulted before coming to Kentucky in connection with the estate testified that upon her return Mrs. Christopher advised him that she had made a settlement with the heirs that would permit her receiving her full portion of the estate. There was no exception to this evidence and its incompetency was thereby waived. The officers of the trust company related that the deed to the one-seventh interest was among Mrs. Christopher's other papers in her safety deposit box in a bank in Yakima and testified to its transmission to counsel in Kentucky.

In July, 1927, after her suit had been filed, Mrs. Christopher employed F. J. Eversole, an attorney at Hazard, in association with her local counsel at Hyden. His testimony is important. Sometimes some of the Miniards were present at their consultations and Mr. Eversole advised the parties to agree upon a compromise. They were always congenial. Cooper Miniard suggested that the heirs were willing to convey the 100-acre Turner survey to Belva in settlement of her suit. Mr. Eversole advised her to go look at the land and he would investigate the title. She came back to Hazard and told him she was willing to accept it. But Mr. Eversole found the title defective. She and Cooper Miniard were so advised and the matter was again discussed. Subsequently, he suggested that the proper

thing for them to do was to convey Mrs. Christopher an interest in the estate and later if the title to the 100 acres was perfected she could accept it as her interest. He prepared the typewritten deed for the one-seventh interest introduced in evidence and gave it to Mrs. Christopher. She returned three or four days later with the deed executed and gave it to him to have recorded. She left in a day or two saying she was going to join her husband in California. He proceeded to have the deed recorded and later mailed it to her. After the talk about accepting the 100 acres, but before he examined the title, Mr. Eversole prepared a deed for it. But it was never delivered and he tore it up. The witness put in evidence the following letter he had received from W. Christopher, dated July 31, 1928, at Elk Creek, Cal.: ''We received from Cooper Miniard a deed for us to sign, by which my wife would exchange her claim on the estate of J. B. Miniard for deed to 100 acres of land, part of this estate, and known as patented to William Turner on December 4th, 1844. Before signing this deed, we want to be sure the title to the above 100 acres is clear. I understand you looked into this matter a year ago and found some flaw in the title; if this has not been straightened out, please advise us. Of course we would also want the deed to the 100 acres signed by all the heirs including Carie who is supposed to be in Florida, but who we have never been able to get in touch with; but of course it would be up to Cooper to get her signature before we would sign the deed sent by him. We would also like to have your opinion, if you consider it advisable to exchange the interest in the entire estate for this 100 acres. We have not heard anything from John Dixon regarding the suit filed by Maggard against the Hyden property. We trust you will look after her interest, if this matter comes up.''

The competency of this evidence and letter was waived by the appellees' failure to file exceptions to it, so it may be considered. Hall v. Hall, 241 Ky. 317, 43 S. W. (2d) 1001; Farley v. Gibson, 235 Ky. 164, 30 S. W. (2d) 876.

We proceed to appraise the evidence and circumstances and consider the justifiable inferences which spring from them. Was the settlement the conveyance of a one-seventh interest in the estate, or of the 100 acres of land? If Mrs. Christopher had been success-

ful in the prosecution of her suit for the breach of contract of her father, she would have recovered the equivalent in value of her share as a child, which was the value of one-sixth less the widow's interest. Benge v. Hiatt's Adm'r, 82 Ky. 666, 56, Am. Rep. 912; Mayfield v. Cupp, 251 Ky. 328, 64. S. W. (2d) 884. It appears to have been a very formidable claim.

Of much potency is the fact that the deed to the one-seventh interest was duly executed by the widow and heirs, delivered to her, seasonably recorded, and found in her possession with her other papers in a safety deposit box. Although the possession by a grantee of an instrument transferring title is not conclusive of a legal delivery, it creates a strong presumption of a complete and effective transfer of title, throwing upon the party questioning it the burden of establishing by clear and convincing evidence that the intention of the grantor and grantee was not to pass title. Hood v. Nichol, supra; Ratcliff's Guardian v. Ratcliff, supra.

On the other side is verbal evidence of the execution of a deed to 100 acres to which the grantors' title was defective and so known to grantee. Such a deed was never produced or its absence undertaken to be accounted for. Nor was it recorded. There is testimony of a manual possession two or three days after it is said to have been executed. None later. The only circumstances indicating an intention to accept title consist of two or three statements by Mrs. Christopher that she had taken the tract as her share and an offer to sell the timber on it to one man and to lease the land to another. Those things are not inconsistent with a conditional acceptance and an anticipated consummation. It is made clear the matter of title had not then been settled. It is significant she never returned to complete the lease to the man who was willing to take it.

The only written memorial of the existence of this deed is the recitation in another by which Mrs. Christopher was undertaking to convey back to the other parties a one-seventh interest in the estate. That deed, however, is void because not executed by the grantor's husband and is to be regarded only as evidentiary. It may be observed also that there were some peculiar conditions appearing on the face of the document.

The rational explanation of the apparently simultaneous execution of these conflicting or irrational conveyances is that the delivery of one or the other was conditional. Judge Eversole clears this up by saying that the agreement of Mrs. Christopher to accept the 100 acres was conditional upon the title being good. When the contingency of the defective title became certain, the condition on which the deed had been received destroyed its acceptance. When it failed, the other deed to a seventh interest became effective and that conveyance complete. The minds of the parties then met, their intentions were accomplished, and the manual transfer of the deed theretofore made became a legal delivery.

This conclusion is fortified by other circumstances. There is Mrs. Christopher's conversation with Turner, the draftsman, when she showed him the prepared typewritten deed and told him she did not believe the heirs would sign it and asked that he prepare the other one. It was not settled then. There is the testimony of Chappell, the deputy clerk, as to the difficulty in reaching a final agreement and his remaining at the Miniard home another day after having taken the acknowledgments and threatening to leave if something definite was not done. The matter was still open. Subsequent action of the Miniards seems significant. They kept possession and paid the taxes. Although the deed to the one-seventh interest was recorded November 14, 1927, it was not attacked as a forgery until November, 1929, six months after Mrs. Christopher's death. Even then nothing whatever was said in the pleading about the conveyance of the 100 acres in settlement of the lawsuit. Indeed, it is there alleged that Mrs. Christopher had no interest whatsoever in any land owned by her father. Later the defendants sought to prove she had become the owner of this tract. It was after that (June 10, 1930) that the instrument signed by Belva Christopher undertaking in a crude fashion to convey to the heirs a one-seventh interest in the estate in the consideration of the conveyance of the 100 acres to her was recorded. No pleading setting that up as the settlement was filed until November, 1934, more than seven years after it is alleged to have been reached. The case had been submitted for judgment although it is fair to say the claim had been made in evidence in July, 1931. The fact that in July, 1928, Cooper Min-

iard sent Mrs. Christopher a deed to be executed by herself and her husband which would convey her interest in the estate in exchange for the proposed conveyance of the 100 acres is proof positive against the defendants' claims that the same transaction had been completed in September, 1927. It corroborates Judge Eversole's explanation. The letter of her husband indicates that even then she was willing to take the tract if a good title could be given. But no title was ever perfected.

The conclusion of the chancellor was that the deed to the 100 acres was the settlement. With that conclusion we cannot agree. We are of the opinion the deed conveying Belva Christopher the one-seventh interest evidences the agreement and that it should be given effect. The sale for about $9,600 of some of the land to the Maggards by the widow and heirs before the filing of the suit as was presented in the case is not sought to be interfered with. All the parties wish to ratify those sales.

The judgment dismissed the petition and amended petition. This we think was error. The plaintiff is entitled to judgment recognizing the one-seventh undivided interest of Belva Christopher's estate in that of J. B. Miniard and adjudicating the entire matter on that basis.

The judgment is accordingly reversed, and the case remanded for proceedings consistent with this opinion.