RENDERED: APRIL 17, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0459-MR

RICKY NELSON HOWARD A/K/A
RICK HOWARD AND HOWARD T.V.
CABLE                                                                          APPELLANTS


APPEAL FROM MAGOFFIN CIRCUIT COURT
v.          HONORABLE KIM C. CHILDERS, JUDGE
ACTION NO. 16-CI-00087


FRANK HOWARD T.V. CABLE,
INC.; CAROL HOWARD; CARTER
HOWARD; DELLA HOWARD;
FRANCES CRACE; HELEN HANCOCK;
JANIE SALYERS; JUDY HOLBROOK;
AND MELISSA PRICE                                                          APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: ACREE, ECKERLE, AND KAREM, JUDGES.

ACREE, JUDGE: Appellants, Ricky Nelson Howard a/k/a Rick Howard and

Howard T.V. Cable (hereafter "Rick"), appeal the Magoffin Circuit Court's

judgment after jury verdict invalidating a deed from Ruth Howard to her son, Rick. Rick argues the trial court erred by denying his motions for directed verdict specifying as grounds that Appellees failed to present sufficient evidence to overcome the presumption of the deed's verity, including the grantor's signature, established by KRS[1] 61.060. The argument persuades us, and we reverse.

## RELEVANT BACKGROUND

The non-corporate Appellees and Rick are siblings. When their mother, Ruth Howard, survived her husband, Frank, she became the sole owner of the couple's real property in Salyersville. Her residence and the family's businesses are situated on some of its several tracts. After Ruth died and after Appellees learned of a deed conveying significant portions of that property to Rick, they brought this action.

Although Appellees began this case on a broader footing, it went to trial over a single claim. As Appellees said in their Pretrial Memorandum, "The only issue to be decided in this Jury Trial is the validity of the Deed which is [the] subject of the original complaint." (Pl. Pretrial Mem. p. [2], filed Jan. 26, 2022). On that count of the complaint, as amended, they alleged the conveyance was the product of Rick's fraud and his forgery of Ruth's signature on the deed. Rick

---

[1] Kentucky Revised Statutes.

denied that allegation and asserted the affirmative defense that fraud was not pleaded with the necessary particularity.

At trial, Appellees presented testimony that first focused on the 75-year history of Frank Howard T.V. Cable, Inc., including the Appellees' participation in business operations. That focus shifted to their testimony about their mother's character and habits, and their lack of knowledge of any intention Ruth may have had to convey the property to Rick.[2] Ignoring the notary's certificate, Appellees then presented their own lay testimony and that of a handwriting expert that Ruth had not personally signed the deed, and Appellees announced their case closed.

Rick moved for directed verdict on several grounds. We find merit in one and therefore will discuss only that—the applicability of KRS 61.060. Rick's motion was concise and legally accurate. He argued the evidence was insufficient to invalidate a deed upon which the grantor's signature was notarized. After citing KRS 61.060 and *Turner v. Howard*, 126 S.W.2d 135 (Ky. 1939), he stated:

> As I understand the caselaw, . . . [t]he notary gives verity on its face and if they're going to challenge the deed, they're going to have to challenge the notary.' And they did not do that. There is a total absence of proof on that.

(Video Record ("VR") 03/31/2025 at 2:00:00 to 2:02:07).

---

[2] Ruth retained a life estate in the tract on which her residence was located.

-3-

Appellees' counsel argued that "[a]s far as the Chapter 61 argument goes, I just think that's completely outside the bounds of what we're doing here." (VR 03/31/2025 at 2:07:10 to 2:07:20).  Failing to recognize any applicability of the statute to the validation or invalidation of a deed, Appellees' counsel said:

> That's not what Chapter 61 is talking about.  Chapter 61 prescribes all kinds of [duties[3]] for local officials, judge executives [sic], etc., who violate the law, the procedures they're supposed to follow in ordinances.  In no way this statute says that you have to sue the notary who notarizes the deed or you don't bring your claim the right way.  If the statute was supposed to say that, that's what the statute would say.  He's asking you to read a whole lot into a very vague statute from 83 years ago in an attempt to bar the plaintiffs' claim.

(VR 03/31/2025 at 2:07:30 to 2:08:02).  Without hesitation, the trial court overruled Rick's counsel's motion for directed verdict.  (VR 03/31/2025 at 2:08:03 to 2:08:06).

Rick's case in defense began with his own testimony.  He then called as witnesses the lawyer who prepared the deed, the notary who certified Ruth's signature, and a handwriting expert, all of whom testified consistently with the presumption of the deed's validity expressed in KRS 61.060.  The notary's appearance in particular gave Appellees an opportunity, if they deemed one was

---

[3] Barely audible on the recording, counsel appears to be saying "duties" which fits the context.

needed, to cure their failure to introduce evidence on the KRS 61.060 issue Rick raised in his first directed verdict motion. (VR 03/31/25 at 9:05:00 to 9:07:13).

Although Appellees challenged the preparer's testimony regarding a mid-deed font change and presented their own handwriting expert, they never challenged the notary's affirmation that he saw Ruth sign the deed at her own kitchen table before certifying she had done so. Instead, their counsel's mere 68 seconds of cross-examination focused solely on the notary's claim of friendship with all the Howard siblings and the fact this was the only deed he notarized for any member of the family. (VR 03/31/25 at 9:07:15 to 9:08:23).

Rick's counsel announced close and renewed his motion for a directed verdict, repeating each argument he urged in his first such motion with "the particularity necessary to allow the trial court the opportunity to pass on the issue in light of all the evidence." *Early v. Commonwealth*, 470 S.W.3d 729, 734 (Ky. 2015) (citation omitted). Again, he argued the evidence was insufficient to overcome the presumption of verity required by KRS 61.060. (VR 03/31/25 at 10:34:00 to 10:34:25 ("Of course, we did call the notary on our case because they failed to prove any abuse of the notary certificate.")).

In response, Appellees' counsel adopted his same response to Rick's mid-trial directed verdict motion. Again, the trial court denied directed verdict.

## STANDARD OF REVIEW

Appellate review of the trial court's denial of a motion for directed verdict is not limited to evaluating the reasons proffered by the trial court for its denial. "Rather, we must make our own review of the entire record to determine whether the trial court's ruling was clearly erroneous." *Brooks v. Lexington-Fayette Urban Cty. Housing. Auth.*, 132 S.W.3d 790, 798 (Ky. 2004).

Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. . . .

*Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459, 461-62 (Ky. 1990) (citations omitted).

*Louisville Metro Government v. Ward*, 610 S.W.3d 295, 307 (Ky. App. 2020).

Importantly here, when reviewing the denial of a directed verdict motion, "[t]he interpretation of statutes is a legal question reviewed *de novo*." *Johnson v. Commonwealth*, 676 S.W.3d 405, 421 (Ky. 2023) (citation omitted).

-6-

ANALYSIS

In his brief to this Court, Rick argues as he did in his motions for directed verdict, that KRS 61.060 prohibits just such direct attacks on the verity of a grantor's notarized signature as Appellees litigated below. Thus, we begin with the statute which we interpret *de novo*. *Id.*

The legislature enacted KRS 61.060 in its original form in 1873, and it survives today without change other than syntax.[4] Today it says:

> No fact officially stated by an officer in respect of a matter about which he is by law required to make a statement in writing, either in the form of a certificate, return or otherwise, shall be called in question, except in a direct proceeding against the officer or his sureties, or upon the allegation of fraud in the party benefited thereby or mistake on the part of the officer.

---

[4] Kentucky's highest court quoted the 1873 version of the law in *Pribble v. Hall*, stating:

Section 17 of chapter 81, Gen. Stat. [1873] reads as follows, viz.:

"Unless in a direct proceeding against himself or his sureties, no fact officially stated by an officer, in respect of a matter about which he is by law required to make a statement, in writing, either in the form of a certificate, return, or otherwise, shall be called in question, except upon the allegation of fraud in the party benefited thereby, or mistake on the part of the officer."

76 Ky. (13 Bush) 61, 65–66 (1877). Syntax again changed ever so slightly in 1903 with adoption of Kentucky Statutes (KS) 3760, which reads:

"Unless in a direct proceeding against himself, or his sureties, no fact officially stated by an officer in respect of a matter about which by law he is required to make a statement, in writing, either in the form of a certificate, return, or otherwise, shall be called in question, except upon the allegation of fraud in the party benefited thereby, or mistake on the part of the officer."

*Husbands v. Polivick*, 96 S.W. 825, 827 (Ky. 1906) (quoting KS 3760 (1903)).

KRS 61.060.  The judiciary's historical interpretation of the law is helpful.

"Prior to the [1873] passage of this statute, it had been held in . . . [several] cases, that it was competent to prove by parol [evidence] that a deed executed by a *feme covert* was not read or explained to her, or that her husband was present when she acknowledged it, and in that manner avoid the deed so far as it affected the married woman."  *Cox v. Gill*, 83 Ky. 669, 670–71 (1886) (citation omitted).  In such an age when women's rights were so limited, this case law served as a modicum of legal protection for married women.  By enacting the statute, the legislature effectively sacrificed that protection "[i]n order to make the title to real estate the more secure . . . ."  *Id.* at 671.  The Court of Appeals explained: "It is of the greatest importance to purchasers that some protection should be afforded them in the transmission of title to realty . . . ."  *Id.* at 671.  The court continued that "[i]f the door is thrown open to such assaults [by a *feme covert*] . . . then no confidence is to be placed in the verity of such records . . . and to rule otherwise would be to permit the validity of the clerk's certificate to be questioned in all cases by parol evidence . . . ."  *Id.* at 671, 673–74.  *See Dowell v. Mitchell*, 82 Ky. 47, 48 (1884) (citations omitted) ("before the General Statutes [ch. 81, sec. 17 (1873)] it was held by this court that, to repel the presumption of fairness, the evidence must be strong and assuring.  But now, to escape the statute,

-8-

fraud or mistake must be averred.").  The new statute was unquestionably effective.

From 1873 until 1917, "the only case in which the certificate of the officer was ever permitted to be impeached [wa]s that of *Aultman–Taylor Co. v. Frasure*, 95 Ky. 429, 26 S.W. 5 [(1894)]."  *City Bank & Tr. Co. of Hopkinsville v. Planters' Bank & Tr. Co. of Hopkinsville*, 195 S.W. 1124, 1125 (Ky. 1917).  In that case, the officer assisted the grantee in coercing the grantor's signature.  *Aultman–Taylor*, 26 S.W. at 6 ("there is evidence the deputy clerk, even, persuaded her to do so").  In 1920, a deputy county clerk was found to have benefited himself by falsely certifying his father's mark (though his father could write his signature) on a deed conveying land to the deputy clerk's minor child who was unaware of the grant.  *Smith v. Ferguson*, 219 S.W. 160, 161 (Ky. 1920).

The law was always applied consistently, likely because the very first interpretation of the statute was perhaps the best.  In 1877, the former Court of Appeals rendered *Pribble v. Hall*, and explained the statute as follows:

> In a suit against the clerk or his sureties for a failure of duty on his part, the truth may be shown, but in every other case his certificate imports absolute verity, unless it be assailed for fraud on the part of the party benefited thereby in procuring it [*i.e.*, in procuring the certificate], or for mistake on the part of the clerk.

76 Ky. at 66.  Sixty years later, the identical interpretation was applied in a case under similar facts as now before this Court, when our high court wrote:

> All pleadings and evidence pertaining to the alleged forgeries of these two instruments must be disregarded. The statute so requires. An official certificate of this kind imports absolute verity unless attacked in a direct proceeding against the officer or his sureties. The instrument must stand as certified, the execution being conclusive and a plea of *non est factum* unavailing except upon an allegation of *fraud in the obtention of the certificate by a party benefited thereby*, or a mistake on the part of the officer. Section 3760, Kentucky Statutes. There was no sort of pleading of this character in the case.

*Christopher's Adm'r v. Miniard*, 102 S.W.2d 978, 980 (Ky. 1937) (emphasis added).

Thus, "the construction placed upon [the statute] in numerous decisions of this court" made clear there are but three ways to overcome the official certificate's presumption of verity. *Turner v. Howard*, 126 S.W.2d at 137. We note that this last cited opinion, *Turner v. Howard*, was directly cited by Rick in his initial motion for directed verdict and his counsel handed a copy of the opinion to the trial court. It set out those three ways.

First, if the allegation is that the certifying officer himself violated his statutory duty, the party claiming the certified document is invalid must bring a direct action against that officer for which he or his sureties or his bond might stand good. *Id.* (citing among other opinions *Byers v. First State Bank of Middlesboro*, 166 S.W. 790 (Ky. 1914)). Of course, a successful direct action of that sort would call into question the validity of the certified document, and there

-10-

are many cases in which a party sought to declare the deed void as a result.  *See generally* n.6, *infra*.  Appellees dwell only on this first way.

They claim this Court must ignore KRS 61.060 because their complaint "did not directly challenge the notary's actions or implicate the notary in the forgery" and that Rick's argument is really that Appellees failed to name the notary as an indispensable party.  (Appellee Br. 11–12).  They support that argument by citing *Fletcher v. Wilson*, 500 S.W.2d 601 (Ky. 1973), but they misread that opinion.  Isolating the "direct proceeding" language from the rest of the statute, the Supreme Court said, "[*T*]*his* language of the statute contemplates a proceeding in which some recovery is sought against the officer by reason of his dereliction, such as a suit on his bond."  *Fletcher*, 500 S.W.2d at 605 (emphasis added) (citation omitted).  Appellees' argument, therefore, is a straw-man argument that ignores the statute's second and third ways to overcome the presumption of verity of a certified signature without a direct proceeding against the notary.

Here is the second way.  If the allegation is that the officer simply made a mistake, a direct action is not necessary.  The complaint need only aver the officer's mistake, for example, that his term as a notary unknowingly expired.  Of course, "the circumstances constituting . . . mistake shall be stated with

particularity." CR[5] 9.02. Appellees never pleaded such a mistake, nor did they present any evidence of a mistake.

And there is a third way to meet the conditions of the statute—that there was a fraud, committed by Rick as the party benefited, in obtaining the notary's certification of Mother's signature as real—*i.e.*, that Rick defrauded an innocent notary. "We have many times written that an officer's certificate imports absolute verity . . . unless there is an allegation of fraud in the obtention of the certificate by the party benefitted . . . ." *Spicer v. Spicer*, 236 S.W.2d 474, 476 (Ky. 1951). Rick unquestionably is the party benefitted by Ruth's grant of property but there is no allegation Rick obtained the property by defrauding the notary. Such a fraud allegation would have to be "stated with particularity." CR 9.02. As noted earlier, Rick asserted the defense, in his answers to both the complaint and amended complaint, that Appellees' fraud claim was not stated with particularity. Even if Rick's defrauding of the notary had been specifically pleaded, there is no evidence to that effect. To the contrary, the record of the notary's uncontested testimony contradicts the notion.

For a century and a half now, a plethora of opinions have stood by this interpretation of the law.[6] As illustrated in the next few paragraphs, a suit directly

---

[5] Kentucky Rules of Civil Procedure.
[6] *See, e.g.*, *Pribble v. Hall*, 76 Ky. (13 Bush) 61, 65–66 (1877); *Doty v. Deposit Building & Loan Ass'n*, 46 S.W. 219, 221 (Ky. 1898); *Hall v. Hall*, 82 S.W. 269, 270 (Ky. 1904); *Duff v. Virginia*

against the alleged perpetrator of a forged grantor's signature without challenging the officer's certificate is not supposed to proceed.

Two cases were litigated, one after the other, between G.J. Atkins' daughter, Mary, and his sister, Ethel Atkins McCoy. *Atkins' Guardian v. McCoy*, 93 S.W.2d 839 (Ky. 1936) (*Atkins' Guardian I*); *Atkins' Guardian v. McCoy*, 120 S.W.2d 1019 (Ky. 1938) (*Atkins' Guardian II*). At the center of both cases was a deed by which Ethel said G.J. conveyed property to her in 1917, shortly before he went off to fight in the Great War. The deputy clerk whose name appeared as having notarized the deed, J.B. Atkins, was G.J.'s and Ethel's brother. Ethel did not lodge the deed of record until 1931. *Atkins' Guardian II*, 120 S.W.2d at 1019.

---

*Iron, Coal & Coke Co.*, 124 S.W. 309, 309, 310 (Ky. 1910) (There was "no evidence [of forgery] . . . except what is contained in her deposition, in which she positively denied that she signed or acknowledged the deed . . . . To authorize [the deed's] overthrow, the court should have before it such evidence as will leave no doubt that the officer had been guilty of fraud or mistake."); *Quinn–Marshall Co. v. Hurley*, 272 S.W. 402, 403 (Ky. 1925); *Thompson v. Board of Drainage Com'rs of Muhlenberg Cnty.*, 79 S.W.2d 381, 382 (Ky. 1935); *Conley v. Coburn*, 179 S.W.2d 668, 670–71 (Ky. 1944); *Spicer v. Spicer*, 236 S.W.2d 474, 476 (Ky. 1951) ("We have many times written that an officer's certificate imports absolute verity unless attacked in a direct proceeding against the officer or his surety, or unless there is an allegation of fraud in the obtention of the certificate by the party benefitted, or mistake upon the part of the officer."); *Jones v. Sutton*, 255 S.W.2d 658, 659 (Ky. 1953) ("When appellants undertake to invalidate the signature of W. D. Sutton, they must also prove fraud or mistake in the execution of the notary's certificate. KRS 61.060"); *Coleman v. Greer*, 343 S.W.2d 584, 584 (Ky. 1961); *Rives v. Pettit*, 513 S.W.2d 475, 478 (Ky. 1974) ("no fact officially certified as required by law may be questioned except in a direct proceeding against the certifying officer or his sureties or upon an allegation of fradu [sic] or mistake on his part"); *Skaggs v. Vaughn*, 550 S.W.2d 574, 576 (Ky. App. 1977); *Sroka–Calvert v. Watkins*, 971 S.W.2d 823, 828 (Ky. App. 1998); *Gibson v. Ky. Farm Bureau Mut. Ins. Co.*, 328 S.W.3d 195, 203 (Ky. App. 2010) ("In the absence of . . . an allegation [of a defective certificate], the notarized document cannot be challenged.").

The notary, J.B. Atkins, died around 1920. The grantor, G.J., died intestate in 1925, leaving his minor child, Mary, as his sole heir at law. *Id.* Mary's guardian took physical possession of the property on her ward's behalf and thereafter paid the property taxes. Six years later, Ethel lodged her deed with the county clerk and Mary's guardian brought a quiet-title action, directly challenging the deed as a forgery without challenging J.B. Atkins' notarization of his brother's signature. *Atkins' Guardian I*, 93 S.W.2d at 840.

In the first suit, Mary's guardian argued to the trial court just as Appellees did here—"that the circumstances proven with inferences to be rationally drawn therefrom established forgery of the grantor's name . . . [and] that the plea of *non est factum* presented by the plaintiff put the burden of establishing the genuineness of the deed upon the defendant and it was not met . . . ." *Atkins' Guardian I*, 93 S.W.2d at 840. *See* Appellees' Br., p. 2 (comparable averments). The trial court rejected this argument noting that Mary's guardian "nowhere undertook to call in question the signature or certificate of acknowledgment of the deputy county court clerk." *Atkins' Guardian I*, 93 S.W.2d at 840. Quoting the then-current version of the statute, KS 3760 (1903), the reviewing court's opinion stated, "The interpretation of this statute has been that the certificate imports absolute verity unless attacked in the manner outlined. This construction has been uniformly followed not only in cases involving the fact of acknowledgment, but as

-14-

well the fact of execution of the instrument itself." *Id.* That is, cases alleging forgery.

The trial court dismissed Mary's guardian's case as failing to state a claim. The reviewing court affirmed, stating, "The petition being fatally defective, it is not necessary to regard the evidence. It may be said there was no pleading to support the evidence, and no evidence to support the pleading." *Id.* That is an accurate description of Appellees' pleadings and proof in this case.

Mary's guardian fared no better with the trial court in a subsequent new action against Mary's Aunt Ethel. The trial court again dismissed the petition.[7] However, this new petition "supplied the allegation which the opinion in the first action said was necessary to state a cause of action." *Id.* at 1021. That is, Mary's guardian "attacked both the deed and the certificate of acknowledgment as

---

[7] The appellate court presumed dismissal of the second petition was based on a *res judicata* argument, then explained why that ground did not apply, stating:

> The [trial] court's reason for sustaining the demurrer to paragraph 1 of the petition [attacking the officer's certificate in a direct proceeding] does not appear, but it is argued in appellee's brief that since the petition referred to the former action, which was an action by the same parties on the same subject–matter, and stated that its purpose was to conform to the opinion of the Court of Appeals, the doctrine of res judicata applied, and the demurrer was properly sustained.

> [However, a] judgment on demurrer to a pleading is judicial determination of the legal sufficiency of the facts pleaded, and a final judgment on demurrer to a petition which goes to the merits renders the whole matter res judicata *so far as the facts alleged are concerned*, but is not a bar to another action where the facts are different and different questions of law are presented.

*Atkins' Guardian II*, 120 S.W.2d at 1020.

-15-

forgeries, and alleged that the deed was not signed or delivered by G. J. Atkins, and was not his act or deed . . . ." *Id.* at 1020. The Court of Appeals reversed the dismissal and ordered the direct proceeding challenging the officer's certification to go forward. *Id.* at 1021. *See Conley v. Coburn*, 179 S.W.2d 668, 672 (Ky. 1944) (exemplifying the nature of a proper attack; "persuasive opinion evidence of several witnesses that the purported signature of G. S. Howard, the Notary Public, is not genuine.").

In their relevant aspects, the case under review is no different from *Atkins' Guardian I.* Appellees failed to allege the elements of any of the three ways to avoid the presumption of verity mandated by KRS 61.060 and that requires reversal. The trial court erred by failing to grant Rick's motions for directed verdict. However, according to *Atkins' Guardian II*, *supra*, our decision "is not a bar to another action where the facts are different and different questions of law are presented." *Atkins' Guardian II*, 120 S.W.2d at 1020.

Our decision renders Rick's other arguments moot and we decline to address them.

CONCLUSION

For the foregoing reasons, we conclude the trial court erred in failing to grant a directed verdict that Appellees' evidence was insufficient to overcome the presumption of verity and validity of the deed in question. We remand this

case to the trial court for entry of orders directing a verdict for the defendants below and reinstating the validity of the deed among the records of the Magoffin County Clerk's Office.

KAREM, JUDGE, CONCURS.
ECKERLE, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

ECKERLE, JUDGE, DISSENTING: Respectfully, I must dissent from the majority's decision to reverse and remand, as I disagree with its application of KRS 61.060 to the underlying facts in this case. That statute – the sole subject and central to the majority's analysis – played a very small part in this case. This matter pits Ricky in one corner against all eight of his siblings in the other in a fight about control of valuable family property and business developed by his deceased Father and held by their now-deceased Mother. The contentions in the decade-long litigation centered on statutes of limitations, standing, fraud, and forgery. All of these claims raised by Ricky fail under the law.

The majority finds merit in the lone argument that there was insufficient evidence as a matter of law to survive a directed verdict motion. And it does so by citing law no one else did below and finding precedent in cases from the 1800s that dealt with women's lack of rights and in a time that we were not allowed to vote. The majority's use of the term "feme covert" (or femme couverte)

is a legal term for a married woman under English law whose "rights" were covered by or merged with her husband's. This coverture has long-since been abolished and should be relegated to the ash heap of history.

Perhaps because of their antiquated origins, and also their questionable relevance, the cases and history were uncited by anyone in this case until the majority for this Opinion took considerable time *sua sponte* to research and provide some historical context for one of the many statutes at issue here. The parties and counsel did not provide the Circuit Court with any of this information. Appellate jurisprudence does not generally mandate busy Trial Courts to use precious time and limited resources available during directed verdict practice in the middle of trial to trace laws back to their origins without the benefit of anyone arguing that it should do so.

Regardless, neither the statute nor case law cited as authority by the majority requires that a party claiming forgery and fraud must name the notary as a defendant. If Ricky wished to take this position, it was incumbent upon him to make a pretrial motion to dismiss based upon the failure to join an allegedly indispensable party. He failed to do so. Further, as the majority acknowledges, the law does not require that a notary be named as a defendant in cases involving fraud or mistake. Under our liberal, notice-pleading requirements, the eight other siblings sufficiently and with particularity made Ricky aware that the notarization

-18-

was improper, as they specifically alleged both fraud and forgery of the deed. The jury found that forgery occurred. Thus, and by necessity, the jury must have believed that fraud, mistake, or both occurred with regard to the notary because if the notarized deed was adjudged a forgery, the jury must have found a problem with the notarization attempting to validate it. As principles of *res ipsa loquitur* dictate, that fact speaks for itself.

And speaking of facts, numerous, key, undisputed, and material facts were omitted from the majority Opinion. I will cite only the most relevant of those here.

In 1950, Father and Mother founded a cable business on property they had acquired. The record does not reflect that either parent ever told Ricky that the blocks of physical property and the thriving, successful business would be devised to him alone.

Purportedly, almost 60 years later, in 2007, Mother devised to Ricky four tracts of land in fee simple, reserving a life estate to herself, by virtue of the deed that is the subject of this litigation. Among many curiosities, Mother's former residence and the office building were not part of this claimed deed. Ricky and his Mother allegedly kept this deed secret for six years. Ricky would later say that he kept forgetting to record it. In 2013, after a destructive tornado, Ricky allegedly uncovered the Deed, and he recorded it with the county clerk. Several

months later Mother died testate. Her will bequeathed the now-disputed property and business to her nine children equally. Siblings first learned of the alleged deed after Mother's death. Ricky began requesting rent payments from his siblings and threatening eviction. This lawsuit commenced ten years ago, in 2016. Significant litigation resulted about which parties were necessary for suit. They included whether spouses should be parties and whether the business should be dismissed as a party. Substantial and unrelated delays ensued.

Attached to a summary judgment motion, Ricky submitted the affidavit of the notary, Jerry Gullett ("Gullett"), who attested to Mother's execution of the Deed in his and Ricky's presence, as well as that of Betty Carpenter, who is now deceased. Gullett also swore that at the time of execution, Mother was mentally competent and not subjected to undue influence. Siblings filed responses discrediting Ricky's arguments, including affidavits from Siblings Della Howard, Francis Crace, and Carol Howard Litteral. Della Howard attested that she had worked closely with Mother at Frank's Cable and was thus familiar with Mother's signature. Della Howard opined that the Deed did not contain Mother's authentic signature. She also claimed that Mother had expressed concern that Ricky "would do whatever he could to rob them" of their share of her estate. Trial Record ("TR"), p. 129. Francis Crace submitted a similar affidavit. Carol Howard Litteral also provided an affidavit, describing her familiarity with

-20-

Mother's signature, her opinion that the Deed was forged, and Mother's caution to Siblings to "watch [Ricky] closely, as he would do whatever he could to rob them of whatever estate she had to leave her children. TR, p. 131.

The Trial Court ruled, by three separate orders, on the main issues before it: the suit was not barred by statutes of limitations; the parties had standing; spouses must be added by amended complaint; the business must remain as a party; and genuine issues of material fact existed as to the forgery and fraud allegations.

Eight years later Siblings' fraud claims progressed to a jury trial on March 31, 2025. Della Howard and Carter Howard both testified that Siblings did not learn of the Deed prior to Mother's death. Della Howard also testified in conformity with the contents of her prior affidavit. Siblings also provided the testimony of Steven Slyter ("Slyter"), an expert, forensic-document examiner. Slyter testified that in his expert opinion, the Deed's signature was not that of Mother. (VR at 03/31/25; 12:57:40.) In comparing samples of Mother's authentic handwriting samples to the signature on the Deed, Slyter opined that the Deed's signature was "significantly unlike" writing patterns demonstrated in her authentic signature. (VR 03/31/25 at 12:52:30.) Slyter's testimony further attacked the validity of Mother's signature by identifying discrepancies in the font utilized in

the signature pages as compared to the Deed's other pages. Slyter's ultimate opinion was that the Deed did not contain Mother's signature.

The jury found in favor of the Siblings and declared that the Deed was a forgery. Their verdict highlighted that the Trial Court only instructed the jury to answer whether Mother's signature was forged. The record before us is unclear as to the reasons that the jury was not provided an additional, alternate instruction on Siblings' general fraud claim. Nonetheless, the jury instructions were agreed to by both parties and are not challenged on appeal. At oral argument, Ricky's counsel stated that he had treated the distinct legal concepts of forgery and fraud as synonymous.

Importantly, Siblings' first cause of action asserted fraud in the form of forgery. Specifically, Siblings claimed that the Deed "contains the forged signature of [Mother], deceased, and should be declared null, void, and of no binding or operative effect." TR, p. 3. Siblings' second cause of action pleaded general fraud as an alternative ground for relief. Siblings alleged as follows: "In the alternative, that should the [D]eed . . . contain the actual signature of [Mother], deceased, that her signature was obtained by [Ricky] by means of fraud and/or deceit, and should be declared null, void, and of no binding or operative effect." TR, p. 4.

With these important facts in mind, I will turn to the legal analysis. But first, I am compelled to mention that Ricky's appellate briefs are riddled with violations of the Kentucky Rules of Appellate Procedure ("RAP"). And while we appreciate brevity, Appellants' brief, clocking in at six pages of text, is woefully short of the substance expected on issues of this magnitude. Ricky's opening "Statement of the Case" fails to identify "the . . . procedural events relevant and necessary to an understanding of the issues presented by the appeal, with ample references to the specific location in the record supporting each of the statements contained in the summary." RAP 32(A)(3). In addition, Ricky's preservation statements and subsequent arguments disregard the RAP's requirement that an argument must conform "to the statement of points and authorities, with ample references to the specific location in the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." RAP 32(A)(4). Our Rules of Appellate Procedure are "critical" to effective appellate review. *Oakley v. Oakley*, 391 S.W.3d 377, 380–81 (Ky. App. 2012). This Court has determined that "substantial compliance" with the RAP is "essential and mandatory." *Id.* For this reason, Courts have the discretion to determine the appropriate penalty for failure to follow their rules. *St. Joseph Catholic Orphan Soc'y v. Edwards*, 449 S.W.3d

727, 732 (Ky. 2014). The majority declined to mention Ricky's failures or levy any sanction, even an admonishment. I would not have been so generous.

Turning to the merits, I cannot agree that the Trial Court's failure to direct a verdict to Ricky upon allegedly insufficient evidence justifies reversal here. Hindsight of course, shows us that the jury believed the evidence of forgery was more than sufficient. The Siblings pleaded both forgery and fraud, and I believe that their pleadings met the particularity requirement. The evidence, which was contested, showed the Deed's lack of authenticity. If the Deed was forged, then the notary's certificate may also have been forged. The majority addresses this point and finds the proof deficient on it. However, it does not address the other possibilities, *e.g.*, the notarization may have been mistakenly or fraudulently attached to the Deed. The jury was not asked – not by the Trial Court and not by any party – to make a particularized finding. Gullett himself provided evidence that he did not read the Deed or other documents that he notarized. This evidence alone, in my view, was sufficient to surpass the very low bar of a directed verdict. But it was not the only evidence. The other Siblings and Slyter testified that the font was different on the signature page. They specifically swore that the signature was not Mother's. This constitutes a genuine issue of material fact that must be decided by a jury – and not by a Judge on directed verdict motion outside of their presence.

-24-

The Siblings alleged a general fraud claim that assumes Mother's signature is authentic and yet procured through Ricky's fraud and/or deceit. This fraud claim subsumes the argument that the notary was not forged; and yet the notarization could nonetheless have been procured by fraud. The Trial Court instructed solely on the forgery, and the jury did not decide the issue of fraud. No one asked it to do so. We do not know whether the jury believed that the forgery was attached to the Deed by Ricky. But we do know that evidence of that allegation existed sufficient to send the question of material fact to the jury. And the jury was not instructed to answer particular interrogatories on this point regarding its verdict; and the law does not require this level of fact-finding from a jury.

Importantly, Ricky did not direct the Trial Court or this Court to *any* case requiring Siblings to name Gullett in the instant lawsuit. We should not develop and advance Ricky's argument further for him.

While the majority, *sua sponte*, offers its own review of the historical case law governing KRS 61.060, it reads a far narrower interpretation into the manner by which a party must assert the relevant exception for "allegation of fraud in the party benefited thereby or mistake on the part of the officer" than can be found there. KRS 61.060. The Trial Court properly denied Rick's motion for a directed verdict under KRS 61.060 because it was not necessary for the Appellees

to name the notary as a defendant or pursue a separate suit against the notary. The Appellees have not challenged the notary's acknowledgment of Mother's signature, implicated the notary in the forgery of the deed, or sought recovery of damages from the notary. But they still alternatively pleaded – and provided evidence of – fraud and forgery in notarizing a forged or fraudulent deed.

As the majority emphasizes, the history of the current KRS 61.060 spans more than a century, and it was crafted by the legislature to cure specific concerns about ensuring a grantee's confidence in deeds to property. However, this lengthy history also results in a body of precedent with dispositions that often relied on procedural rules and guidelines that are no longer in existence in our modern court system. Most notably, much of the early precedent cited by the majority turns on a failure to challenge a notary's signature in the original complaint or through a bill of exceptions, rendering the argument unavailable and the suit invalid under the predecessor to KRS 61.060. *See Christopher's Adm'r v. Miniard*, 102 S.W.2d 978 (Ky. 1937); *Jones v. Sutton*, 255 S.W.2d 658, 659 (Ky. 1953).

While much of the case law prior to *Jones v. Sutton* notes that the inquiry into validity ends with the failure to challenge the notary's acknowledgment in the original pleading or by bill of exceptions, the inquiry shifts with that case. 255 S.W.2d at 659. In *Jones*, the Court confirmed that in seeking

to invalidate a deceased individual's signature on a notarized petition for adoption, the appellants "must also prove fraud or mistake in the execution of the notary's certificate. KRS 61.060." *Id.* Although the Court considered the appellants' failure to challenge the notarized signature through a bill of exceptions, it proceeded to rule on the merits of the case. The Court noted that evidence had been offered by both sides regarding the issue of forgery, including competing testimony by various family members and handwriting experts. Ultimately, the Court concluded:

> With the question still in doubt, the balance wheel of conviction is swung heavily in favor of the signature by the testimony of the notary public who acknowledged it. With commendable honesty, he stated that he could not recollect the actual signing, but his conclusion was based upon the recognition of his own signature. The substance of his testimony is that if he acknowledged Mr. Sutton's signature, Mr. Sutton signed. This is the very purpose of acknowledgments[.] Lapse of time may dim a memory, but a signed certification of a fact remains positive as long as the writing lasts. [This] is why only clear and convincing parol evidence will overthrow it.

*Id.* at 660. Because the evidence offered by the appellants "fell materially short of that degree of certainty necessary to overturn the adoption judgment," the Court affirmed the Chancellor's ruling.

While *Jones* did not concern a deed to property, the analysis that the Court conducted is indicative of the line of precedent that follows in reviewing the case *sub judice*. In *Skaggs v. Vaughn*, this Court reviewed Skaggs' attempt to

-27-

challenge a deed he had signed conveying property to his first wife's nieces. 550 S.W.2d 574 (Ky. App. 1977). Skaggs claimed that he been misled as to the contents of the document but did not allege fraud in the notarization or mistake on the part of the notary. *Id.* at 576. The Court held that Skaggs could not challenge his actual signature without challenging the notary's acknowledgment of the same. Therefore, the Court affirmed the decision of the lower court, which had properly found that the statute of limitations barred Skaggs' claim of fraud. *Id.* We reaffirmed this conclusion two decades later in *Sroka-Calvert v. Watkins*, when we noted that "[w]here a mistake on the part of the notary is alleged, the notary's testimony is no longer conclusive on the issue of the authenticity of a signature." 971 S.W.2d 823, 829 (Ky. App. 1998). In another case, *Dressler v. Barlow*, we noted that an appellant seeking to overturn summary judgment could not challenge whether she was properly served without asserting either fraud on the part of the appellee or mistake on behalf of the deputy sheriff who certified that he had formally delivered the summons and complaint. 729 S.W.2d 464 (Ky. App. 1987).

Finally, we returned to this question in *Gibson v. Kentucky Farm Bureau Mutual Insurance Co.*, when we reviewed Kentucky Farm Bureau's suit against two of its customers who filed fraudulent claims for the theft of an insured vehicle. 328 S.W.3d 195 (Ky. App. 2010).[8] After changing hands multiple times,

---

[8] The majority's author here also wrote the opinion for *Gibson* in 2010.

an innocent purchaser attempted to register the vehicle with a notarized title signed by the original owners, Gibson and Bowman, which had been reported as stolen to the Kentucky State Police. Reviewing the effect of the notarized title, we held:

> As an official act, a notarized document cannot be attacked absent direct proceedings against the notary or "the allegation of fraud in the party benefited thereby or mistake on the part of the [notary]." KRS 61.060. While Gibson and Bowman both testified they never signed the title before a notary, they also did not assert the signed, notarized title was the result of fraud on the part of either [of the intermediary possessors of an allegedly stolen truck]. In the absence of such an allegation, the notarized document cannot be challenged. The document is therefore conclusive on the issue[.]"

*Id.* at 203. However, in finding the document conclusive, we considered a number of factors that were relevant to the holding. First, Bowman and Gibson admitted that the signatures on the title were genuine, asserting only that they had signed the document years earlier and that their signatures had not been contemporaneously notarized at the time of signing. Further, the other interested parties testified that the truck was transferred at the time the title was notarized, which occurred several months prior to Gibson's and Bowman's reporting the vehicle was missing. Gibson and Bowman did not allege fraud by any of those parties. After Kentucky Farm Bureau introduced the notarized title, Gibson and Bowman did not argue that the notary had used a false date in ratifying their signatures, and they offered no other evidence to explain the discrepancy in their timeline of events. It was only

after considering all of these factors that this prior panel concluded that KRS 61.060 would not allow further attack on the validity of the notarized title.

This line of cases cited by the majority clearly demonstrates that a notarized document can be challenged through an assertion of fraud by the party who benefits from the title or deed under certain circumstances. However, it does not clearly prescribe a single manner in which this contest must be done, only that a notarized document cannot be found to be invalid without also invalidating the certificate of acknowledgment. The body of case law shows that a claim can instead be successful in a number of ways, including by submitting evidence of fraud by the notary in making the acknowledgment;[9] fraud by the grantee in forging the acknowledgment;[10] or some other factor that resulted in a notary mistakenly acknowledging an otherwise invalid signature.[11] In each of these cases,

---

[9] As the majority noted, the deputy clerk in *Smith v. Ferguson* falsely certified his father's mark on a deed conveying land to the clerk's minor child, and the Court accordingly found the deed to be void despite the certificate of acknowledgment. 219 S.W. 160, 161 (Ky. 1920).

[10] In *Turner v. Howard*, two notaries testified that deeds allegedly transferring ownership to Mrs. Turner's stepson did not bear their authentic signatures and that they had not witnessed or acknowledged Mrs. Turner's signature. 126 S.W.2d 135 (Ky. 1939). Although the majority echoes Appellant's argument that the deed at issue in that case was found to be valid, it is notable that Mrs. Turner offered no impeachment evidence to the third notary, who testified that he did recall traveling to her home to witness her signature on the deed in question.

[11] In *Sroka-Calvert v. Watkins*, we considered whether the Circuit Court had properly issued a directed verdict in a suit between the estates of a deceased husband and wife. 971 S.W.2d at 829. The wife's estate alleged that her husband had forged her signature on documents transferring all jointly held stocks and bonds into the husband's name alone, which allowed him to place the proceeds in a trust for the benefit of the wife until her death and then allow everything to pass to his heirs. Because the stock transfers were found to match the notarized

the substance of the analysis turned on whether the party challenging the notarized document had offered proof of fraud or mistake to refute the presumption of validity granted by the acknowledgment. When the challenging party did not offer any substantial evidence, the challenge appropriately failed.

Moreover, this wider reading of the statute is also consistent with the precedent cited by the Appellees on appeal, which addresses the propriety of naming an official as a defendant. In *Fletcher v. Wilson*, 500 S.W.2d 601 (Ky. 1973), our Supreme Court was tasked with evaluating the legal sufficiency of a jurat in papers concerning the candidacy for official office. *Id.* at 604. Among the many arguments advanced in that case, the appellant argued that the notary, a named defendant, failed to require the affiant to affirm the truthfulness of the contents of the document – *i.e.*, the notary failed to administer an oath. *Id.* at 605. In *dicta*, the Kentucky Supreme Court explained that the "language of the statute contemplates a proceeding in which some recovery is sought against the officer by reason of his dereliction. . . ." *Id.* "Absent a direct proceeding for recovery against the officer, the statute requires an allegation of fraud or mistake." *Id.* Situated

---

signature on unrelated deeds, the Circuit Court granted a directed verdict in reliance on KRS 61.060 to validate the deeds and both sets of signatures. However, we noted on appeal that those deeds had been challenged in a separate proceeding on the grounds of mistake by the notary, as the wife was subsequently adjudged disabled and incompetent to act in her own interest at substantially the same time as the signing due to a stroke that occurred several years earlier. Because a jury could have found the wife was not competent to sign the transfer documents and, by extension, the deeds, we reversed the directed verdict and remanded the case for further proceedings.

within the larger body of case law, *Fletcher* demonstrates a clear delineation between the need to assert fraud in the creation of a document or mistake on the part of the notary in fulfilling his duty in general when seeking to invalidate a notarized document, and the need to join the notary as a party only when seeking direct recovery against his office.

Turning to the case *sub judice*, I disagree with the majority that the Appellees failed to assert fraud or mistake on the part of the notary. In its analysis, the majority cites to the pair of cases designed by the majority as "*Atkins' Guardian I*" and "*Atkins' Guardian II*" for the proposition that a party wishing to challenge a document falling under KRS 61.060 must explicitly and unambiguously plead fraud in both the subject document and the certificate of acknowledgement. *Atkins' Guardian v. McCoy*, 93 S.W.2d 839 (Ky. 1936); *Atkins' Guardian v. McCoy*, 120 S.W.2d 1019 (Ky. 1938). As previously noted, however, I do not believe that our subsequent line of precedent directs such a rigid or formulaic reading of the statute and case law. Instead, the Courts have tended to consider the totality of the evidence in determining whether a party has challenged the validity of a certificate. Where a grantee is like to rely on the acknowledgment to support his argument of validity, the party challenging a notarized document has many more avenues available to him in showing the presence of fraud or mistake, as the wide variety of case law cited by the majority shows.

Although the Appellees did not directly challenge the authenticity of the certificate of acknowledgment on the deed at issue, the testimony presented at trial did call into question whether the certificate of acknowledgment attached on the final page of the deed had truly come from that document. In support of this suggestion, expert witness Slyter noted discrepancies in the font utilized in the signature pages as compared to the deed's other pages, which Appellant's expert witness Dr. Larry Miller also acknowledged. Cross-examination of Gullett revealed that he had never reviewed the contents of the purported deed and that he had merely witnessed the signature prior to notarizing the document. While Appellees could certainly have argued a clearer chain of reasoning that the combined deed and signature page together created a forged document, even if the signature had been made by Mother and mistakenly witnessed by Gullett on some other document, the evidence offered is sufficient to assert a disputed issue of fact upon which reasonable minds could differ. *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998). There was also no requirement that Appellees join Gullett as a party to the suit, since there is no allegation of intentional fraud on his part or any recovery sought from Gullett personally.

In light of this evidence, I do not find error in the Circuit Court's decision that KRS 61.060 did not require it to grant Appellant's motions for a

directed verdict.  Finding no merit in the remainder of Appellant's arguments on

appeal, I would affirm the Circuit Court's Order and Judgment.


BRIEFS FOR APPELLANTS:          BRIEF FOR APPELLEES:

Eldred E. Adams                 James R. Tanner Hesterberg
Louisa, Kentucky                Pikeville, Kentucky